IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 21-00239-01-CR-W-HFS |
| ) | |
| ROBERT M. TAYLOR, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Robert M. Taylor's Motion to Suppress Statements (Doc. #26). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On August 23, 2021, a Criminal Complaint was filed against defendant Robert M. Taylor. On October 5, 2021, the Grand Jury returned a fourteen-count Indictment charging defendant Taylor with seven counts of Hobbs Act robbery and seven counts of using, carrying, and brandishing a firearm during a crime of violence.

An evidentiary hearing on defendant Taylor's motion to suppress was held on March 23, 2022. Defendant Taylor was represented by Assistant Federal Public Defender Carie Allen. The Government was represented by Assistant United States Attorney Byron H. Black. The Government called Sergeant Vernon Huth[1] of the Kansas City, Missouri Police Department as a witness. The defense called no witnesses to testify.

---

[1] Sergeant Huth is also a Task Force Officer with the FBI. (Tr. at 5.)

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On August 11, 2021, a robbery occurred at a Family Dollar store on Blue Ridge Boulevard in Kansas City, Missouri. (Tr. at 6.) Surveillance video from the Family Dollar store showed a gentleman walk in and make a purchase with an EBT card (commonly referred to as food stamps). (Tr. at 7.) A short time later, the surveillance video showed the same man walk in wearing the same clothing, only this time with a backpack out of which he pulled a handgun. (Tr. at 7-8.) The man robbed the clerk at gunpoint. (Tr. at 7.) Surveillance video also showed the man run toward a silver vehicle that was parked in an adjacent lot and get in on the passenger's side. (Tr. at 8, 29.) The license plate on the silver vehicle was captured on the automatic license plate reader system within close proximity to the robbery. (Tr. at 8.) The plate came back to the same party to whom the EBT card was issued, Tiara Montgomery. (Tr. at 8-9.)

2. Witnesses to the robbery gave a description of what the suspect was wearing during the robbery, including the clothing, the backpack, and a unique Kansas City ball cap. (Tr. at 9.) Another notable feature about the suspect which was observed on the video and described by the witnesses was the suspect's gait, in that he walked and/or ran with a limp. (Tr. at 9.) Sergeant Huth found this significant because there were six or seven other robberies beginning in December 2020 where an individual with the same gait was seen fleeing robberies and/or walking up to businesses that were robbed. (Tr. at 9-10.)

3. Given the clue of Tiara Montgomery, officers looked on her Facebook page and found that she was in a relationship with Robert Taylor and that they had a child in common. (Tr. at 10.) There was also a photo on Ms. Montgomery's Facebook page of Montgomery standing next to the very car that was used as the get-away vehicle in the Family Dollar robbery. (Tr. at 10.)

4. Officers then looked at Robert Taylor's Facebook page and saw him unmasked posing in numerous pictures wearing the same shoes that were worn by the individual involved in a couple of the robberies. (Tr. at 10.)

5. Sergeant Huth testified that law enforcement had previously received a tip that Robert Taylor may be involved in the robberies. (Tr. at 11.) The tip included Taylor's full name, middle initial, and date of birth. (Tr. at 11.)

6. Sergeant Huth and Detective Castelletto decided to issue a pickup advisory (that is an investigative arrest) for Robert Taylor. (Tr. at 11.) Sergeant Huth also

discovered that there were two outstanding felony arrest warrants for Taylor. (Tr. at 11.)

7. On August 19, 2021, law enforcement officers observed a subject believed to be Robert Taylor leaving Tiara Montgomery's residence. (Tr. at 11-12.) The subject was wearing a distinctive Kansas City ball cap that looked like the cap worn by the individual who robbed the Family Dollar on August 11, 2021. (Tr. at 12.) Ms. Montgomery was driving a black Dodge Charger and the subject believed to be Taylor was a passenger in the vehicle. (Tr. at 12-13.) Officers initiated a stop of the vehicle. (Tr. at 12.) Detective Huth testified that Ms. Montgomery was very forthcoming, but the subject later identified as Taylor did not want to cooperate. (Tr. at 12.) When the subject finally exited the vehicle, the officers noted his limp. (Tr. at 13.) Taylor eventually identified himself and the officers took him into custody on the pickup advisory and arrested him on the outstanding warrants. (Tr. at 13.) Taylor was transported to the Metro Patrol Division. (Tr. at 13.)

8. Sergeant Huth and Detective Castelletto met with Robert Taylor in an interview room at the Metro Patrol Division at approximately 9:35 p.m. (Tr. at 13-14, 27.) The interview was recorded by video and audio and admitted as Government's Exhibit 2. (Tr. at 21-23.) Sergeant Huth testified that he introduced himself to Taylor as an FBI Task Force Officer and showed Taylor his credentials and badge. (Tr. at 16; Gov. Exh. 2 at 21:42:32.) Sergeant Huth and Detective Castelletto were not in uniform. (Tr. at 15.) Sergeant Huth's firearm was locked in a lockbox outside the interview room. (Tr. at 15.) Sergeant Huth believed that Detective Castelletto also left his firearm outside the interview room. (Tr. at 15.) Sergeant Huth testified that no one brandished or displayed a weapon. (Tr. at 16.) Taylor was not handcuffed or otherwise restrained. (Tr. at 17.)

9. At the start of the interview, Sergeant Huth told Mr. Taylor that before they could talk about why he was there, Taylor needed to be advised of his rights. (Tr. at 17; Gov. Exh.2 at 21:42:40.) Sergeant Huth testified that Taylor was asked if he was familiar with his *Miranda* rights and Taylor said that he was; that he had been in police custody before. (Tr. at 17.) Detective Castelletto then verbally advised Taylor of his rights. (Tr. at 17; Gov. Exh. 2 at 21:43:00-32.) After being advised of each *Miranda* right, Taylor verbally acknowledged that he understood each of those rights. (Tr. at 18, 33; Gov. Exh. 2 at 21:43:00-32.) Sergeant Huth talked with Taylor about getting consent for a buccal swab for Taylor's DNA and presented Taylor with a consent form. (Tr. at 18-19.) Taylor refused to give consent for the buccal swab. (Tr. at 19; Gov. Exh. 2 at 21:51:08.)

10. Taylor expressed concern about the amount of time he would face if he incriminated himself. (Gov. Exh. 2 at 21:52:32, 21:58:00, 22:00:23.) Sergeant Huth testified that Mr. Taylor was "very concerned about that he would be going back to jail for a very, very long time." (Tr. at 20.) The officers tell Taylor "no,

3

that's not true," when Taylor states that he is going away forever and disagree with Taylor when he said he is going to get life. (Gov. Exh. 2 at 21:52:38, 22:19:23.) Sergeant Huth testified further:

> And during the interview, I explained to him, I said, well, I think the courts have actually lessened some things where they not necessarily stack, and I gave him a time range of what I understood the law to be after that. And I said they had been reduced greatly.

(Tr. at 20-21.) Sergeant Huth told Taylor that the law used to be five to twenty-five years for the first armed robbery and then an additional twenty-five years for each armed robbery thereafter, but that the law had changed. (Gov. Exh. 2 at 21:54:54-21:55:04.) Sergeant Huth testified that he told Taylor his understanding of the range of punishment because Taylor was very concerned about that. (Tr. at 28.) Sergeant Huth testified that he did not make any intentional misrepresentations or lies to Taylor. (Tr. at 28.) Sergeant Huth testified, "I was just trying to ease his mind during the interview that the range of punishment had been lowered. I was just trying to be honest." (Tr. at 29.)

11. During the interview, Sergeant Huth showed Mr. Taylor printed images that had been taken from surveillance videos during various robberies. (Tr. at 19-20.) Sergeant Huth testified that Taylor ultimately admitted that he had committed these robberies and placed his initials on the photos which showed him during the crimes in progress. (Tr. at 19-20.) Taylor also admitted that he had used real guns during the robberies and then sold the guns on the street after each robbery. (Tr. at 21.)

12. At the time of his arrest and interview, Mr. Taylor was 34 years old. (Tr. at 24.) He has earned his GED. (Gov. Exh. 1.) Sergeant Huth testified that Taylor did not appear to be frightened, intimidated, or confused during the interview. (Tr. at 24.) Sergeant Huth did not believe Taylor to be under the influence of drugs or alcohol. (Tr. at 24-25.) Taylor has a significant criminal history which is set out in his Pretrial Services Report (Gov. Exh. 1). (Tr. at 2-3, 25-26.) Sergeant Huth testified that Taylor seemed familiar and comfortable with law enforcement. (Tr. at 26.) The interview lasted approximately one hour. (Tr. at 26-27.) Sergeant Huth testified that Taylor did not appear fatigued or overly tired during the interview. (Tr. at 27.)

13. Sergeant Huth testified that he did not threaten or intimidate Mr. Taylor. (Tr. at 29.) Sergeant Huth testified that he did not threaten Taylor's family or significant others. (Tr. at 29.) With respect to comments that Sergeant Huth made about possibly investigating Tiara Montgomery, Huth explained:

> I explained to him the vehicle's license plate come [sic] back to her and the vehicle was registered to her. And I actually implored him, and more or less probably hurt an investigative technique of mine, because I said, hey, please don't call her on the phone because I'm going to hear about it. And I think that's almost verbatim what I did say to him in regard to Ms. Montgomery. I said because at some point I'm going to have to talk to her. And I think his reply was, that's fine, she didn't have anything to do with it anyway.

(Tr. at 29.) Sergeant Huth provided this further explanation as to why he would need to talk with Ms. Montgomery:

> She was the owner of the vehicle. And obviously, he wasn't driving the vehicle. He got in the passenger's side, so there was another party involved in the -- in driving the vehicle that day. So, I needed to see if, in fact, it was her or it was not her.

(Tr. at 29-30.) Sergeant Huth testified that he did not bring up Ms. Montgomery as a means of threatening or coercing Taylor to talk. (Tr. at 30.) Sergeant Huth told Taylor, "I don't want to drag Tiara into any trouble. . . . I'm not looking at hurting her at all." (Gov. Exh. 2 at 22:11:05-17.) Sergeant Huth stated that he was just letting Taylor know that he would be talking to Ms. Montgomery. (Tr. at 30.)

14. Sergeant Huth testified that he did not make any promises to Mr. Taylor about receiving leniency. (Tr. at 30.) Sergeant Huth testified that he did, however, tell Taylor that if he had knowledge of additional crimes, he could proffer that information at a later time and that it could help him. (Tr. at 30.) Sergeant Huth also told Taylor that there is acceptance of responsibility in the federal system. (Gov. Exh. 2 at 22:13:28.) Sergeant Huth testified that he told Taylor that he did not make any sentencing decisions. (Tr. at 30.) The officers told Taylor that they do not decide the time Taylor will face and that they did not know how much time he would get. (Gov. Exh. 2 at 22:03:39, 22:23:50, 22:31:57.)

15. Sergeant Huth testified that Mr. Taylor never invoked his right to remain silent. (Tr. at 31.) Sergeant Huth further testified that Taylor never indicated that he wanted an attorney present. (Tr. at 31.)

### III. DISCUSSION

Defendant Taylor seeks to suppress the statements he made to law enforcement officers on August 19, 2021. (Motion to Suppress Statements at 1; Doc. #26.) Defendant Taylor argues that officers obtained these statements in violation of his *Miranda* rights. (*Id.*)

5

"The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings are necessary because "the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements." *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (citations omitted). *Miranda* is triggered when a suspect is (1) interrogated (2) while in custody. *Griffin*, 922 F.2d at 1347. There does not appear to be any dispute that defendant Taylor was interrogated while in custody. The issue before the Court is whether defendant Taylor knowingly and voluntarily waived his *Miranda* rights.

"A waiver of the Fifth Amendment privilege against self-incrimination is valid if the waiver is made voluntarily, knowingly and intelligently." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The Eighth Circuit Court of Appeals has provided the following guidance in assessing a defendant's claim that statements to law enforcement must be suppressed because a *Miranda* waiver was not voluntary, knowing, and intelligent:

> There are "two distinct dimensions" to the inquiry whether a suspect's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 . . . (1986). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* We consider the totality of the circumstances in determining whether a suspect's waiver is valid. *Id.*

*United States v. Gayekpar*, 678 F.3d 629, 638 (8th Cir.), *cert. denied*, 568 U.S. 921 (2012).

"The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004). The government need not produce an explicit written waiver or a formal, express oral statement of waiver to meet this burden. *See Berghuis v. Thompkins*, 560 U.S. 370, 383-84 (2010). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384. Further, "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385.

Looking at the two dimensions to the inquiry whether defendant Taylor's waiver of his *Miranda* rights was voluntary, knowing, and intelligent, the Court notes first that the evidence presented at the hearing does not suggest that Sergeant Huth intimidated, coerced, or deceived defendant Taylor prior to or during the interview. Sergeant Huth testified that he did not threaten or intimidate defendant Taylor, his family, or significant others.[2] (Fact No. 13.) Sergeant Huth further testified that no one brandished or displayed a weapon and that Taylor was not handcuffed or otherwise restrained during the interview. (Fact No. 8.) Sergeant Huth testified that he did

---

[2] Defendant Taylor argues that Sergeant Huth threatened to involve Taylor's significant other, Tiara Montgomery, in the investigation, by saying "I don't want to involve Tiara; take her car; do unnecessary things." (Motion to Suppress Statements at 2; Doc. #26.) The Court has reviewed the videotape of the interview. While Sergeant Huth brought up Ms. Montgomery during the interview, the Court does not interpret Sergeant Huth's words as a threat to involve Ms. Montgomery in the investigation. Rather, Sergeant Huth explained to the defendant that the car used in the robbery came back registered to Ms. Montgomery. Sergeant Huth told the defendant that he would have to talk to Ms. Montgomery because of the car. Sergeant Huth specifically stated: "I don't want to drag Tiara into any trouble. . . . I'm not looking at hurting her at all." (Fact No. 13.)

7

not make any intentional misrepresentations or lies to Taylor.[3]  (Fact No. 10.)  Sergeant Huth also testified that he did not make any promises to Taylor about receiving leniency.[4]  (Fact No. 14.)

---

[3] Defendant Taylor argues that Sergeant Huth deceived him by giving "incorrect legal advice regarding the 'stacking' changes for robbery cases."  (Motion to Suppress Statements at 2; Doc. #26).  The Court has reviewed the videotape of the interview.  With respect to "stacking," Sergeant Huth told defendant Taylor that the law used to be five to twenty-five years for the first armed robbery and then an additional twenty-five years for each armed robbery thereafter, but that the law had changed.  (Fact No. 10.)  The law actually was changed by the First Step Act.  The United States Sentencing Commission wrote:

> The First Step Act limits "stacking" of the 25-year penalty imposed under 18 U.S.C. § 924(c) for multiple offenses that involve using, carrying, possessing, brandishing, or discharging a firearm in furtherance of a crime of violence . . . . Section 924(c) . . . requires a mandatory minimum penalty of 25 years for each "second or subsequent conviction" of an offense under section 924(c).  Prior to the enactment of the First Step Act, these longer penalties applied even when a defendant was convicted of multiple section 924(c) counts in the same case. . . . The First Step Act limits the application of the 25-year penalty by providing that the 25-year enhanced penalty at section 924(c)(1)(C) applies only to offenders whose instant violation of 924(c) occurs after a prior section 924(c) conviction has become final.  As a result, a defendant can no longer be sentenced to a "stacked" 25-year penalty based on another section 924(c) conviction in the same case.

United States Sentencing Commission:  The First Step Act of 2018, One Year of Implementation at 34-35 (Aug. 2020) (footnotes omitted).  The evidence presented does not support a finding that Sergeant Huth attempted to deceive Taylor by explaining his understanding that the law had changed with respect to "stacking" armed robbery offenses.

[4] Defendant Taylor argues that "[t]he law enforcement officers repeatedly promise Mr. Taylor leniency."  (Motion to Suppress Statements at 2; Doc. #26).  The Court has reviewed the videotape of the interview.  While the officers did tell Taylor "no, that's not true," when Taylor stated that he is going away forever and disagreed with Taylor when he said he is going to get life, the officers also pointed out that they do not decide the time Taylor will face and that they did not know how much time he would get.  (Fact Nos. 10 and 14.)  Further, while the officers did discuss proffering for downward departure and acceptance of responsibility as mechanisms to lessen a sentence (Fact No. 14), these discussions of options do not support a finding that the officers promised Taylor leniency.

8

Second, the Court finds that defendant Taylor waived his rights with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Sergeant Huth testified that Taylor was asked if he was familiar with his *Miranda* rights and Taylor said that he was as he had been in police custody before. (Fact No. 9.) Detective Castelletto then verbally advised defendant Taylor of his *Miranda* rights. (*Id.*) After being advised of each *Miranda* right, Taylor verbally acknowledged that he understood each of those rights. (*Id*.) The evidence supports the finding that Taylor was aware of the consequences of a decision to abandon his rights as he expressed concern about the amount of time he would face if he incriminated himself.[5] (Fact No. 10.)

Finally, the characteristics and behavior of defendant Taylor suggest that Taylor's consent was voluntarily given. Taylor was 34 years old. (Fact No. 12.) Based on the videotaped interview, Taylor appears to be of average intelligence in that he answered the officers' questions appropriately. (See Gov. Exh. 2.) Taylor was not a novice criminal.[6] (Fact No. 12.) Sergeant Huth testified that defendant Taylor did not appear to be under the influence of drugs or alcohol

---

[5] Defendant Taylor argues that he "exhibits hesitancy in waiving his right to remain silent multiple time during the interrogation. At one point, early in the questioning, he states 'as soon as I say the wrong shit about [unintelligible], to which TFO Huth responds "no, that's not true." (Motion to Suppress Statements at 2; Doc. #26.) The Court has reviewed the videotape of the interview and finds that Taylor actually stated: "As soon as I say the wrong shit about myself, I'm going away forever." (Gov. Exh. 2 at 21:52:32-38.) In any event, a "hesitancy in waiving his right to remain silent" is not an invocation of the right to remain silent and stop the questioning. *See United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) (to adequately invoke the right to remain silent a suspect must indicate a clear or unequivocal desire to remain silent; being evasive and reluctant to talk or indirect, ambiguous, and equivocal statements of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*).

[6] "A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary." *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir.), *cert. denied*, 565 U.S. 866 (2011).

nor did he appear fatigued or overly tired during the interview (which commenced at approximately 9:35 p.m. and lasted approximately an hour). (Fact Nos. 8 and 12.) Sergeant Huth further testified that Taylor did not appear to be frightened, intimidated, or confused during the interview. (*Id.*) Instead, Taylor seemed familiar and comfortable with law enforcement. (*Id.*) Taylor even exhibited the ability to decline an officer's request when he refused to give consent for the buccal swab. (Fact No. 9.)

The evidence before the Court shows that after advising defendant Taylor or his *Miranda* rights, Sergeant Huth and Detective Castelletto interrogated Taylor about a number of robberies. At no point did Taylor say that he wanted to remain silent, that he did not want to talk with the officers, or that he wanted an attorney. There is no basis to conclude that Taylor did not understand his rights. Based on the facts before the Court, it follows that Taylor knew what he gave up when he spoke to the officers. The Court further finds that the officers did not attempt to intimidate, coerce, or deceive Taylor. After considering the totality of the circumstances, the Court concludes that defendant Taylor voluntarily, knowingly, and intelligently waived his *Miranda* rights. The government has met its burden of proving the validity of the *Miranda* waiver.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Taylor's Motion to Suppress Statements (Doc. #26).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

        */s/ Lajuana M. Counts*
        Lajuana M. Counts
        United States Magistrate Judge